Mary Ellen OWENS, et al.,

v.

CITY OF PHILADELPHIA, et al.

Civil Action No. 94–4654.

United States District Court,
E.D. Pennsylvania.

May 13, 1998.

Kenneth M. Dubrow, Goldstein, Friedberg, Kelly, Divito & Dubrow, Philadelphia, PA, for Plaintiffs.

Leon A. King, II, City of Philadelphia, Law Dept., Civil Rights Unit, Philadelphia, PA, for Defendants.

## OPINION

LOUIS H. POLLAK, District Judge.

This is an action brought under 42 U.S.C. § 1983 and two Pennsylvania statutes for damages stemming from the suicide of Patrick Gaudreau on August 14, 1992 in the Philadelphia Detention Center. The plaintiffs are the administratrix of Gaudreau's estate and the decedent's surviving children. The defendants are the City of Philadelphia, several Philadelphia Prison System officials, and a number of correctional officers from the Philadelphia Detention Center. Currently before the court is the defendants' motion for summary judgment.

### Background

After extensive discovery, the parties have developed a considerable record. Following is a summary of the background thus revealed:

On July 17, 1992, Gaudreau was incarcerated at the Philadelphia Detention Center ("the Detention Center") after he allegedly violated a state-court protective order prohibiting him from abusing, harassing, or threatening his parents. On July 22, 1992 Gaudreau was transferred, pursuant to an involuntary mental health petition, to the Hahnemann Correctional Mental Health Services Unit ("Hahnemann Unit").[1] The basis for the petition was a report that Gaudreau had set a fire in his cell and was kicking the cell's window.

Upon admission to the Hahnemann Unit, Gaudreau was examined by Dr. Mahmood Dadvand. Dadvand diagnosed Gaudreau as "bipolar manic with psychosis." In his examination report, Dadvand found Gaudreau to

---

1. The Hahnemann Unit is a mental health services facility operated by Hahnemann University and located in the Health Services Wing of the Detention Center.

be "hostile, verbally abusive toward the doctor and correctional officers" and to have "anger outbursts, antisocial attitudes and assaultive ideas." Dadvand checked the box denoting: "The patient is severely mentally disabled and in need of treatment." Gaudreau's treatment consisted of admission to the Hahnemann Unit as an inpatient, with assault and fire precautions, and a course of antidepressant medication.

The next day, July 23, 1992, Municipal Court Judge Thomas Dempsey ordered Gaudreau to undergo a mental health evaluation to determine whether he should be committed. He was then remanded to the Philadelphia Prison System to be assigned for the evaluation. Between July 23 and July 25, 1992, Gaudreau was again incarcerated at the Philadelphia Detention Center. On July 25, he was readmitted to the Hahnemann Unit. The admission summary, signed by Dadvand, indicated a host of psychiatric symptoms, including: excessive and pressured speech, angry outbursts; hostility and agitation; inappropriate, demanding, and threatening interview behavior; flight of ideas; delusions and assaultive ideas; and homicidal threats. Dadvand reiterated his earlier diagnosis and recommended hospitalization with antipsychotic medication and precautions against fire and assault.

Gaudreau was hospitalized in the Hahnemann Unit from July 25 to August 4, 1992. He was treated by Dr. Sharon Wainwright, who noted that Gaudreau had a prior history of psychiatric hospitalization. During this period, Gaudreau was placed in restraints twice and there was initially some difficulty in getting Gaudreau to take his medication. On August 4, 1992, Gaudreau was discharged as an inpatient and returned to the cell block, where he was treated as a Hahnemann outpatient. Gaudreau was assigned to A Block, a unit housing other Hahnemann Unit outpatients. On August 11, Gaudreau was interviewed by Hahnemann social worker Emil

Matula, who noted that Gaudreau "still sometimes has passing thoughts of hurting self or doing something to himself." Gaudreau remained at the Detention Center until his suicide on August 14, 1992.

On that day, defendants Sean Murphy and Preston McDaniels were the correctional officers assigned to A Block from 7:00 a.m. to 3:00 p.m. At approximately 1:30 p.m., Gaudreau approached Murphy. At his deposition, Murphy testified that Gaudreau "stated that he felt schizy and he was going to hurt himself." Murphy then telephoned the Hahnemann Unit and spoke with Wainwright, the psychiatrist who had most recently treated and discharged Gaudreau. Murphy informed Wainwright of Gaudreau's statements. Murphy testified that Wainwright responded by saying "that she was extremely busy at that time" but would issue a pass for Gaudreau to be released to the Hahnemann Unit at 3:00 p.m. Murphy also stated that Wainwright opined that "this sounds like someone who just wants to get off the block." Wainwright testified that she wrote a pass for Gaudreau at 2:00 p.m. authorizing Gaudreau to come to the Hahnemann Unit between 3:00 and 3:15 p.m.[2]

After this phone conversation, Murphy spoke to Gaudreau, informing the detainee about the pass that would issue. Gaudreau then walked away in the direction of the prison's gym. At approximately 2:20 p.m., Gaudreau asked Officer McDaniels if there was a pass for him to see the doctor. At approximately 2:40 p.m., Wainwright noticed that the pass had not been delivered. At approximately 2:45 p.m., Gaudreau returned from the gym and Murphy locked Gaudreau in his cell alone. Murphy made no entry regarding any of these events in the officers' log. When he was relieved at 3:00 p.m. by officers Eric Lewis and Wayne Robinson, Murphy did not inform the incoming officers of Gaudreau's statement or the fact that a pass was going to be issued. Nothing in the

---

**2.** Wainwright also testified that she did not authorize Gaudreau to see her right away because she had a patient in her office and there were other patients in the waiting area. Wainwright testified that the officer in charge of the waiting area operated under an unwritten policy by which he would allow no more than two patients

in the waiting area, and thus if Gaudreau had been sent to the Hahnemann Unit, he would most likely have been sent back to the cell block. Wainwright testified that it was worse for a patient to be brought to the unit only to be returned to the cell block than it was for a patient to wait.

record suggests that the pass was ever delivered.

Lewis and Robinson were assigned to A Block from 3:00 p.m. to 11:00 p.m. Lewis began an inspection tour of A Block at the commencement of the shift. Lewis testified that when he looked into Gaudreau's cell, he saw the detainee lying on his cot. Robinson testified that, while at the control booth at approximately 3:35 p.m., he received a phone call from Wainwright, who stated that she had a pass for Gaudreau and asked why Gaudreau had not shown up for his appointment. Robinson asked an "inmate worker" to see if Gaudreau was in his cell. The inmate worker shouted to Robinson that Gaudreau had hanged himself. Robinson testified that he ran toward the cell, but could not reach it or see inside because 15–16 inmates were there. He then returned to the control booth and informed Wainwright that Gaudreau appeared to be hanging in his cell. Lewis testified that he then went to the cell for the first time and observed Gaudreau hanging (but he never actually entered the cell).

 After returning to the control booth, Robinson called Sergeant Gail Morris at Center Control. Morris informed Lieutenant William Russell who, with Correctional Officer Nicole Brown, went to Gaudreau's cell. Neither brought anything with which to cut Gaudreau down. When they arrived at approximately 3:40, Robinson was in the control booth and Lewis was at the threshold of the cell. Russell and Brown observed Gaudreau hanging by a bed sheet which was tied to a clothes hook, which was approximately five feet from the floor. According to the investigative report of the Philadelphia Prison System's Internal Affairs Division ("IAD report") and the photographs of the scene, Gaudreau was hanging in a sitting position. Russell directed Brown to find an instrument with which to cut the body down. Brown was unable to find any such instrument. It is uncontested that none of the officers on the scene attempted to untie or remove the sheet. Russell testified that he attempted to lift Gaudreau, but was unable because the body was too heavy. The conclusions embodied in the IAD report, however, are in some tension with Russell's testimony. The IAD report states:

> Contrary to Lieutenant Russell's statement that he attempted to lift the inmate so that he could be cut down, eyewitness accounts place him outside of Patrick Gaudreau's cell, and that [*sic*] neither he nor any other staff member made an attempt to cut the inmate down.

Accordingly, there appears to be a conflict in the evidence with respect to Lieutenant Russell's actions.[3]

---

3. Defendants object that some of the inmate statements recorded in the report are hearsay. The admissibility of the inmate statements to which defendants object need not be addressed, as plaintiffs do not rely upon them and they are not necessary to the resolution of this motion. I will, however, briefly consider the admissibility of those statements within the report that I will consider in ruling upon this motion. As to the conflicting accounts of Russell's actions, the Internal Affairs report is admissible. These accounts—by nurses Chang and Detweiler—are credited in the conclusion of the investigator's report, which places them within the hearsay exception provided for public records by the Federal Rules of Evidence. Rule 803(8)(C) excepts from the hearsay exclusion "factual findings resulting from an investigation made pursuant to an authority granted by law, unless the sources of the information or other circumstances indicate a lack of trustworthiness." The fact that these statements were iterated in support of the investigator's conclusion that Russell (among others) "failed to take proper and decisive action," place them under the rubric of "factual

findings" within the contemplation of the rule. The Internal Affairs Division is empowered to investigate prison incidents, and there is nothing to suggest that the report and its sources—two nurses who were eyewitnesses on the scene—are untrustworthy, the findings are admissible under Rule 803(8)(C). *See In re Nautilus Motor Tanker Co.*, 85 F.3d 105, 111 (3d Cir.1996); *Foster v. General Motors Corp.*, 20 F.3d 838, 839 (8th Cir.1994)(*per curiam*).

Even if the statements were not in their present form admissible under Rule 803(8)(C), they may nonetheless be considered in deciding this motion. Rule 56 does not require that "the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The accounts of the scene credited by the IAD Report could be presented at trial in the form of testimony by the nurses; hence the account may be considered in ruling upon this motion. *See id.; see also Williams v. Borough of*

Shortly after the arrival of Russell and Brown, two prison nurses arrived. They were followed by Dr. Wainwright, who in turn was followed by Dr. Caucci, who pronounced Gaudreau dead at approximately 3:50 p.m.

## I. Federal Civil Rights Claims

### A. Governing Legal Principles

Plaintiffs assert civil rights claims against various individual correctional officers, the City, and two prison officials (the two officials are sued in both their individual and official capacities). All of the federal claims are governed by the standard that the Supreme Court first articulated for Eighth Amendment medical maltreatment claims in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)—"deliberate indifference."[4] However, what "deliberate indifference" signifies, in the context of this case, varies somewhat as the concept is applied to different sets of defendants. Accordingly, before analyzing the claims against each of the defendants in turn, I will briefly survey the permutations of "deliberate indifference" as those permutations come into play with respect to the different sets of defendants.

(1) Plaintiffs' claims against Detention Center correctional officers Murphy and McDaniels (as well as their individual-capacity claims against Philadelphia Prison System

officials Warden Wilhelmina Speach and Deputy Commissioner Thomas Costello) concern these defendants' conduct *before* the suicide. It has been established within this circuit that § 1983 can provide a remedy for a pretrial detainee's suicide. The Third Circuit first articulated the standard for this species of § 1983 liability in *Colburn v. Upper Darby Township*, 838 F.2d 663 (3d Cir.1988)("*Colburn I*"), and elaborated upon it in *Colburn v. Upper Darby Township*, 946 F.2d 1017 (3d Cir.1991) ("*Colburn II*").

Drawing on Supreme Court cases analyzing issues of medical maltreatment in prison (*Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)) and personal security of inmates while in custody (*Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986)), the Third Circuit fashioned a standard for § 1983 liability in detainee suicide cases based on "reckless indifference." *Colburn I*, 838 F.2d at 669. According to this standard, as restated in *Colburn II*, prison officers can be found liable if "(1) the detainee had a 'particular vulnerability to suicide,' (2) the custodial officer or officers knew or should have known of that vulnerability, and (3) those officers acted with 'reckless indifference' to the detainee's particular vulnerability." *Colburn II*, 946 F.2d at 1023 (quoting *Colburn I*, 838 F.2d at 669).

*West Chester*, 891 F.2d 458, 465 n. 12 (3d Cir.1989)(opinion of Becker, J., announcing judgment of the court)("[H]earsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present that evidence through direct testimony.").

4. This is not to say, however, that the Eighth Amendment is formally the predicate for plaintiffs' claims in this case. The decedent in this case was a pretrial detainee. Because pretrial detainees have, by definition, not been adjudicated guilty of any crime, the state is prohibited from punishing them at all, not merely from punishing them in ways that are cruel and unusual. A pretrial detainee's rights, therefore, are governed by the due process clause of the Fourteenth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 557, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The due process rights of pretrial detainees are certainly at least as substantial as the Eighth Amendment rights of convicted prisoners (see *Boring v. Kozakiewicz*, 833 F.2d 468, 472 (3d

Cir.1987)(applying Eighth Amendment standard of *Estelle* to pretrial detainees)) and may, arguably, be more substantial (see *Whitley v. Albers*, 475 U.S. 312, 326, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)(noting that the Court has reserved the question of whether pretrial detainees are entitled to greater protections than convicted prisoners with respect to medical treatment and protection from harm); *Kost v. Kozakiewicz*, 1 F.3d 176, 188 n. 10 (3d Cir.1993)("It appears that no determination has as yet been made regarding how much more protection unconvicted prisoners should receive.")). However, whatever the degree of constitutional protection to which pretrial detainees are entitled, there seems little doubt that it is not so demanding that simple negligence would be actionable as a constitutional claim. The Supreme Court has held in other contexts that a claim of negligence is not cognizable under the Fourteenth Amendment's due process clause. *See Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986).

The second element in this test, that concerning the extent to which a defendant was aware of the risk of suicide, was further explained in *Colburn II*. Noting that an intervening case (*Williams v. Borough of West Chester*, 891 F.2d 458 (3d Cir.1989)) employed the term "deliberate indifference," the court declined to distinguish between "reckless" or "deliberate" indifference. *Id.* at 1024. The court did, however, state that the phrase "should have known," as employed in the second prong of the *Colburn I* standard, signifies "something more than a negligent failure to appreciate the risk ... though something less than subjective appreciation of the risk." *Id.* at 1025.

■ Thus clarified, the *Colburn I* standard arguably requires further reexamination in light of the Supreme Court's opinion in *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). *Farmer* was an Eighth Amendment case concerning prison officials' duty to protect (convicted) inmates from harm. Justice Souter, writing for the Court, clarified the meaning of "deliberate indifference" in Eighth Amendment jurisprudence. The Court considered two alternatives with respect to the mental state required for an Eighth Amendment violation: (1) a "civil recklessness" standard, requiring that liability is predicated on a substantial risk of harm, of which the defendant knew or should have known, or (2) a "criminal recklessness" standard under which an officer may not be held liable unless he or she subjectively knew of the risk. The Court concluded that the "criminal recklessness" standard comports with both the text and interpretations of the cruel and unusual punishments clause. *Id.* at 839–40, 114 S.Ct. 1970. Hence, the Court held that the culpability of defendant officers under the "deliberate indifference" standard is determined by a subjective test:

[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837, 114 S.Ct. 1970. Thus for Eighth Amendment claims to succeed after *Farmer*, the plaintiff must demonstrate actual subjective knowledge on the part of the individual defendant.

The Third Circuit has yet to revisit its *Colburn I* doctrine (as clarified in *Colburn II* ) in the light of the Supreme Court's decision in *Farmer*. Defendants urge that *Farmer* mandates that the second prong of the standard be modified to state a subjective standard of knowledge. However, because *Farmer* is a case interpreting the requirements of the Eighth Amendment with respect to convicted prisoners, it is not directly controlling on the subject of the due process clause's protection of those who are detained pending trial. *See Whitley v. Albers*, 475 U.S. 312, 326, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *supra* note 4.

Thus whether, or to what extent, pretrial detainees in the instant context are entitled to greater protection than the Eighth Amendment provides to convicts is an open question. Some courts of appeals have decided that the Eighth Amendment standard of deliberate indifference, with a subjective knowledge component, applies to pretrial detainees' claims of inadequate medical assistance and inadequate protection against suicide. *See, e.g., Hare v. City of Corinth*, 74 F.3d 633, 648–49 (5th Cir.1996)(*en banc* )(suicide prevention); *Salazar v. City of Chicago*, 940 F.2d 233, 237 (7th Cir.1991)(medical assistance). Additionally, one district court within this circuit has ruled that the *Colburn* test must be modified to be consistent with *Farmer*. *Swan v. Daniels*, 923 F.Supp. 626, 631 (D.Del.1995). Indeed, although the Eighth Amendment is not technically the basis for plaintiffs' claims, the *Estelle* opinion provides one of the principal "theoretical underpinnings" for the *Colburn* standard. *Colburn II*, 946 F.2d at 1017. Accordingly, the Supreme Court's interpretation of *Estelle* in *Farmer*, if not flatly controlling, could be said to evidence at least an indication of the Court's view of how Fourteenth Amendment doctrines that derive from *Estelle* should be analyzed.

For the purposes of this motion, however, it is not necessary to provide an ultimate answer to this question, since the outcome of this motion would be the same whether the standard requires subjective knowledge or not. As the discussion below will make clear, the individual defendants fall into one of two camps: (1) defendants with respect to whom there is evidence from which subjective knowledge of the risk of suicide can be inferred (which evidence would also support a finding of liability under an objective standard), or (2) defendants with respect to whom the evidence suggests neither knowledge nor facts suggesting that they should have known. Since the defendants in camp (1) are not entitled to summary judgment under the subjective standard (criminal recklessness), and the defendants in camp (2) would be entitled to summary judgment even under an objective standard (civil recklessness), it is not necessary to decide which standard is the appropriate one.[5] *See Boswell v. County of Sherburne*, 849 F.2d 1117, 1120 & n. 4 (8th Cir.1988)(affirming denial of summary judgment in medical maltreatment case while declining to decide whether a standard other than *Estelle* should apply, given that the result would be no different under a different standard). Accordingly, this opinion will assume, without deciding, that subjective knowledge is required when deciding to deny summary judgment, further noting that defendants as to whom summary judgment is granted would be entitled to summary judgment even on the objective standard.

(2) The claims against correctional officers Lewis and Robinson, as well as those against Lieutenant Russell, involve alleged acts and omissions that occurred *after* Gaudreau was found hanging. There are no allegations, and there is no record evidence suggesting, that these defendants had either actual or constructive knowledge of Gaudreau's suicidal propensity. Because these claims do not present any issues of preventive measures, they will be analyzed as medical maltreatment claims, for which I will assume (for the reasons set forth above) that the Eighth Amendment standard set forth in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), supplies the relevant analytic principles. In that case, the Court held that the Eighth Amendment is violated when prison officials display "deliberate indifference to serious medical needs of prisoners." *Id.* at 104, 97 S.Ct. 285. Accordingly, I will examine these claims on the assumption that they are governed by *Estelle*, as further elaborated in *Farmer* (while reserving the question of whether a more protective standard may apply to pretrial detainees). *See Kost v. Kozakiewicz*, 1 F.3d 176, 188 & n. 10 (3d Cir.1993).[6]

 (3) Finally, the claims against the City and the official-capacity claims against Warden Wilhelmina Speach and Deputy Commissioner Thomas Costello are governed by another variation on the "deliberate indifference" theme. *Farmer* requires that Eighth Amendment claims against prison officials in their individual capacities meet a subjective state of mind requirement. The test is otherwise for claims against entities such as the City (as well as the official capacity claims that are essentially identical to those claims). These claims rest on allega-

---

**5.** Evidence suggesting that a defendant "should have known" of a risk can, in many instances, also support an inference that subjective knowledge is present. As Justice Souter explained in *Farmer*:

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

511 U.S. at 842, 114 S.Ct. 1970. Thus, a defendant can be shown to have had actual subjective knowledge of a risk if the fact-finder finds that the defendant had all the data from which risk could be inferred. The circumstantial evidence permitting the fact-finder to draw the inference, however, would also constitute direct evidence of objective knowledge.

**6.** I will, at this time, hazard only this observation: The Eighth Amendment's cruel and unusual punishments clause—which underpins the subjective "criminal recklessness" standard articulated in *Farmer*—seems rather remote from the values appropriate for determining the due process rights of those who, although in detention, have not been convicted of any crime. *See supra* note 4. In the event that this case goes to trial, I will request briefing on this issue before fashioning the jury charge.

tions of a policy and practice of deliberate indifference to suicidal detainees through the failure to train prison staff on inmate suicide precautions. As the Court noted in *Farmer,* the test for deliberate indifference with respect to a municipality is, of necessity, an objective one given that "considerable conceptual difficulty would attend any search for the subjective state of mind of a governmental entity." 511 U.S. at 841, 114 S.Ct. 1970. Therefore, with respect to the claims against the City and its officials, liability can follow from imputed knowledge if,

> in light of the duties assigned to the specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

*Id.* at 840, 114 S.Ct. 1970 (quoting *Canton v. Harris,* 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

Attention now turns to the application of the foregoing principles to the defendants in this case. Because the defendants' summary judgment motion is before the court, the record will be viewed in the light most favorable to the plaintiffs. Summary judgment is appropriate only if there is no genuine issue of material fact such that a reasonable factfinder could find for the non-moving party. Fed. R. Civ. P. 56(c); *Reliance Ins. Co. v. Moessner,* 121 F.3d 895, 900 (3d Cir.1997). For the reasons set forth below, defendants' motion will be granted in part and denied in part.

### B. Individual Corrections Officers

At the outset, it must be noted that plaintiffs do not oppose summary judgment in favor of corrections officers Brown, Clark, and Morris, as well as Deputy Commissioner Joseph Gallagher and Deputy Commissioner John Daughen. Accordingly, defendants' summary judgment will be granted *in toto* as to these defendants. Attention therefore turns to the claims against the remaining individual corrections officers: Murphy, McDaniels, Lewis, Robinson, and Russell.

### 1. Corrections Officer Murphy

■ *Alleged Constitutional Violation.* As explained above, the claims against officers Murphy and McDaniels concern acts and omissions prior to Gaudreau's suicide and are therefore governed by the standards set forth in *Colburn I* and *Colburn II.* Defendants concede that whether Gaudreau had a vulnerability to suicide is an unresolved issue of material fact. Accordingly, left for decision is whether these remaining individual defendants are entitled to judgment as a matter of law on the issues of knowledge and deliberate indifference, the second and third prongs of the *Colburn* inquiry.

Murphy argues that he is entitled to judgment as a matter of law because (1) he had no knowledge of any suicidal vulnerability on the part of Gaudreau and, alternatively, (2) his actions did not amount to deliberate indifference. As noted above, Murphy was one of the two officers assigned to Gaudreau's cell block from 7:00 a.m. to 3:00 p.m. on the date of the suicide. And it was to Murphy that Gaudreau made the statement that he felt "schizy" and that he was "going to hurt himself."

■ On the basis of Gaudreau's statement to Murphy, plaintiffs have plainly raised an issue of fact with respect to Murphy's knowledge of Gaudreau's suicidal vulnerability. Defendants point out that no evidence indicates that Murphy understood "schizy" to mean suicidal. There is, however, very little ambiguity about Gaudreau's statement that he would hurt himself. Murphy's having heard this statement, as he testified on deposition, raises a genuine issue of material fact. As the Court in *Farmer* pointed out: "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm would actually befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." 511 U.S. at 842, 114 S.Ct. 1970. Gaudreau's remark to Murphy that he would hurt himself is sufficient to evidence such a substantial risk.

Defendants seek to minimize the importance of Gaudreau's statement by arguing that Murphy testified that suicide threats

were not unusual on A Block, thereby suggesting that Gaudreau's threat should not have been taken seriously. The logic underlying this proposition is elusive. It is difficult to see how it is that the reported prevalence of suicide threats in a cell block known to house psychiatric outpatients suggests that Gaudreau's statement of suicidal intent should not be taken seriously. But if one assumes that there is a reasonable basis for giving Murphy's testimony about what Gaudreau said the very little significance for which defendants argue, all this means in the present context is that the defendants have simply offered counter-evidence on a disputed factual issue, viz., Murphy's knowledge of Gaudreau's vulnerability to suicide. Moreover, any implication that Murphy saw no basis for taking Gaudreau's statement seriously is, to at least some extent, undermined by the undisputed fact that Murphy promptly called the psychiatric unit. This act could, in the contemplation of a trier of fact, suggest that Murphy found the statement sufficiently serious to merit the attention of a psychiatrist. The call would thus support a reasonable inference that Gaudreau's particular vulnerability to suicide was known (in addition to the inference of knowledge that can be drawn from Gaudreau's comment to Murphy). Therefore, viewing the record most favorably toward the plaintiffs, it is clear that there is a triable issue with respect to Murphy's knowledge.

■ Defendants, however, also argue that even if the knowledge element raises an issue of fact, Murphy's initial actions—calling Wainwright and telling Gaudreau that Wainwright would issue him a pass—demonstrate that Murphy was not, as a matter of law, deliberately indifferent. This argument also fails to persuade.

Calling the Hahnemann Unit was, without question, a reasonable and appropriate action. However, the gravamen of plaintiffs' claim concerns Murphy's *subsequent* acts and omissions. The fact that Murphy called Wainwright and knew that Wainwright intended to issue a pass does not insulate Murphy from the possibility that any of his other acts or omissions could be found to have been deliberately indifferent. Far from providing a shield, in fact, Murphy's earlier action could lead a jury reasonably to find against him regarding his subsequent omissions. Murphy was aware that Gaudreau was a psychiatric outpatient. Murphy appears to have thought that Gaudreau's statement about self-harm was sufficiently serious to warrant a call to the psychiatric unit. As a result of this call, Murphy knew that Wainwright agreed to see Gaudreau, which again suggests seriousness (notwithstanding Murphy's testimony that Dr. Wainwright remarked that Gaudreau might just be trying to get off of the block).[7]

Given the evidence suggestive of Murphy's knowledge that Gaudreau had a serious suicidal propensity, Murphy's conceded omissions—(1) to note Gaudreau's statement about hurting himself in the prison log, (2) to inform the incoming officers of Gaudreau's statement, (3) to inform his superior officer of the incident, and (4) to fill out an involuntary commitment form—cannot be said to be constitutionally reasonable as a matter of law. All of those omissions were contrary to directions contained within a document the City proffers as evidence of its then-extant policies on suicide prevention—a 1988 memorandum on suicide prevention which was, so defendants aver, utilized in the training of correctional officers.[8] Because the omissions

---

7. It should also be noted that Dr. Wainwright's testimony is not entirely consistent with Murphy's testimony about what Dr. Wainwright said. At her deposition, Dr. Wainwright testified: "I wasn't assessing him over the phone. Assessments, psychiatric assessments are generally not done over the phone, not even in the modern day of computers." Thus, to the extent that defendants may be understood to be arguing that Dr. Wainwright's putative statement to Murphy suggests that Murphy did not have the requisite knowledge of the seriousness of Gaudreau's risk

of suicide, there is counter-evidence raising an issue of material fact.

8. The memorandum states, in pertinent part, under the heading "Block Officer's Responsibilities":

Signs of suicidal behavior and threats must be entered in the Log Book & communicated to your supervisors and to the next shift. Refer to the Psychiatric Unit. Fill out 783 Form immediately.

Under the heading "Precautions!" the document states:

complained of could be found to have been among the factors resulting in the non-deliverance of the pass at a time contemporaneous to the last sighting of Gaudreau alive, plaintiffs have made a showing of the requisite causal nexus. Furthermore, a fact-finder could reasonably conclude that Murphy's failure to inform the incoming officers foreclosed the possibility of their monitoring Gaudreau in such a way that they might have detected his preparations or at least discovered the hanging earlier.[9] Murphy's subsequent act—locking Gaudreau alone in a cell whose distance from the control booth rendered the cell less susceptible to monitoring—is also not entitled as a matter of law to constitutional exoneration.

Viewing the record evidence in a light favorable to the nonmovants, and drawing all reasonable inferences accordingly, I conclude that a reasonable jury could find that these acts and omissions constituted deliberate indifference. Therefore, plaintiffs have raised triable issues with respect to defendant Murphy.

*Qualified Immunity:* Murphy also raises qualified immunity as a bar to this suit. Qualified immunity protects government officials when their "conduct does not violate clearly established constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

> 1) If you suspect someone is suicidal, remove all articles from the cell that can easily be used for self-harm these include belts, sharp objects, easily torn materials, matches, drugs, medication.
> 2) House resident with another resident and, when possible, close to the correctional Officer's post.
> 3) *IF UNABLE TO WATCH RESIDENT CONSTANTLY—REPORT THIS TO YOUR SUPERVISOR. TOURS MUST BE MADE AT LEAST EVERY FIFTEEN MINUTES MORE OFTEN AT NIGHT AND AT IRREGULAR INTERVALS.*

9. Defendants argue that *Freedman v. Allentown,* 853 F.2d 1111 (3d Cir.1988), compels the conclusion that Murphy's conceded failure to inform the incoming officers (or any other officers) of Gaudreau's suicide threat or the Hahnemann Unit pass was not deliberately indifferent as a matter of law. In *Freedman,* the court of appeals affirmed, inter alia, the district court's dismissal of claims against a probation officer. Plaintiff's

In deciding a motion for summary judgment when the defense has been raised, the court "appropriately may determine, not only the currently applicable law, but whether the law was clearly established at the time an action occurred." *Id.* Initially, the plaintiff bears the burden of showing that the defendant's conduct violated some clearly established statutory or constitutional right. *See In re City of Philadelphia Litig.,* 49 F.3d 945, 961 (3d Cir.1995). If this burden is carried, the defendant must demonstrate the absence of a genuine issue of material fact as to the "objective reasonableness" of the defendant's actions. *Sherwood v. Mulvihill,* 113 F.3d 396, 398 (3d Cir.1997).

With these principles in mind, I will consider (i) whether the governing law was clearly established when Gaudreau committed suicide, (ii) whether plaintiffs have met the burden of producing evidence indicative of a violation of the clearly established law, and (iii) whether defendants have shown that Murphy's conduct is objectively reasonable.

(i) As developed in section I.A above, the Third Circuit's *Colburn* decisions, applying the Eighth Amendment "deliberate indifference" standard to inmate suicide cases, provide the governing law for the claims against Murphy. I turn now to the question whether these governing legal principles were clearly established at the time of Gaudreau's suicide: August 14, 1992.

claim against the probation officer rested on the fact that the officer failed to inform the custodial officers of the detainee's prior suicide attempt. The court of appeals reasoned that the probation officer's failure to inform the custodial officers amounted only to negligence. The facts of *Freedman,* however, are strikingly different from those in this case. That ruling concerned a probation officer who had visited the jail where the detainee was housed. *Id.* at 1117. Unlike Murphy, the relevant defendant in *Freedman* was not a custodial officer and thus lacked the level of responsibility for the detainee that custodial officers have. *Cf. Williams v. Borough of West Chester, Pa.,* 891 F.2d 458, 466–67 (3d Cir.1989) (opinion of Becker, J. announcing judgment of the court)(noting that a civilian dispatcher could not be held liable for detainee's suicide because he had no custodial duties). Furthermore, the failure to inform in *Freedman* concerned the detainee's prior medical history, not, as in this case, an expression of suicidal intent made a few minutes before the relevant officer's shift ended.

In deciding whether the law is clearly established, the Supreme Court has cautioned against looking at the constitutional issue on a level of abstract generality. *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Rather,

> the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.* Elaborating upon the "clearly established" standard, the Third Circuit has emphasized that it has "adopted a broad view of what constitutes an established right of which a reasonable person would have known." *See, e.g., Burns v. County of Cambria,* 971 F.2d 1015, 1024 (3d Cir.1992); *Stoneking v. Bradford Area Sch. Dist.,* 882 F.2d 720, 726 (3d Cir.1989). Accordingly, our circuit has stressed that "there does not have to be 'precise factual correspondence' between the case at issue and a previous case in order for a right to be 'clearly established,' and we would not be 'faithful to the purposes of immunity by permitting ... officials one liability-free violation of a constitutional or statutory requirement.'" *Burns,* 971 F.2d at 1024 (quoting *People of Three Mile Island v. Nuclear Regulatory Comm'rs,* 747 F.2d 139, 144–45 (3d Cir.1984)).

■ The application of the Eighth Amendment standard to the suicide of pretrial detainees, the particular context in which plaintiffs' claims are raised, was clearly articulated and refined by the Third Circuit's *Colburn I* and *Colburn II* cases, decided in 1988 and 1991 respectively, before the events of August 14, 1992. The *Colburn* application of the deliberate indifference standard had also been followed in other reported cases prior to the events at issue in this case. *See, e.g., Williams v. Borough of West Chester Pennsylvania,* 891 F.2d 458 (3d Cir.1989); *Freedman v. City of Allentown,* 853 F.2d 1111 (3d Cir.1988). Given the amount of appellate development of the applicable legal principles, and the specificity of the context in which these principles have been applied, it is evident that the constitutional protection of pretrial detainees from official indifference to known suicidal tendencies was clearly established at the time of Gaudreau's suicide.

The resolution of issue (ii)—whether plaintiffs have made a showing of constitutional injury—is embedded in the foregoing. As the discussion above indicates, plaintiffs have clearly alleged, and provided evidence of, a constitutional deprivation sufficient to meet their burden.

■ Finally, with respect to issue (iii), the presence of triable issues with respect to officer Murphy's conduct makes it clear that defendants have not met their burden of showing that there is an absence of material fact with respect to the objective reasonableness of Murphy's conduct. Defendants seek support in the Eighth Circuit's decision in *Rellergert v. Cape Girardeau County,* 924 F.2d 794 (8th Cir.1991), where the court affirmed the district court's entry of judgment notwithstanding the verdict on immunity grounds. However, the facts in *Rellergert* were significantly different from what the record in this case would permit a fact-finder to conclude. In *Rellergert,* the decedent committed suicide after he was identified as a suicide risk and placed on suicide watch. The defendants, pursuant to the operative policy, placed the decedent in "a common area of the jail where he could be observed by a duty officer ... from a centrally located booth." *Id.* at 795. The shower and bathroom area, however, were not visible from the control booth, and it was in the shower that the decedent hanged himself. The duty officer in the booth had observed the decedent enter the shower and bathroom area, and had an inmate check on the decedent because he had not returned promptly. *Id.* Under these circumstances—where the decedent had been identified as a suicide risk and where precautions were taken according to the operative policy—the court held that the precautions taken were constitutionally ade-

quate. In this case, by contrast, viewing the record in the light most favorable to plaintiffs, there is evidence from which a fact-finder may reasonably conclude that Murphy failed to take appropriate precautions in spite of an obvious risk of suicide. *See Farmer*, 511 U.S. at 842, 114 S.Ct. 1970; *supra* note 4. In contrast to the events in *Rellergert*, it is undisputed in this case that what the City proffers as the operative policy at the time in question was not followed by Murphy. Hence, *Rellergert* is not apposite on this record.

Accordingly, summary judgment will be denied as to defendant Murphy.

### 2. *Corrections Officer McDaniels*

As noted in part I above, McDaniels was assigned to A Block with Murphy on the 7:00 a.m. to 3:00 p.m. shift on the day of the suicide. Unlike Murphy, however, there is no evidence in the record from which a jury could reasonably infer that McDaniels was deliberately indifferent to a known risk of suicide. Although there is substantial evidence in the record from which a fact-finder could conclude that Gaudreau had a particular vulnerability to suicide, nothing in the record suggests that McDaniels had any knowledge indicative of that vulnerability. McDaniels was not party to Gaudreau's statement to Murphy, and there is no evidence that Murphy informed McDaniels of the statement. To be sure, it does appear that Gaudreau asked McDaniels at approximately 2:20 p.m. whether there was a pass for him to see the doctor. But there is nothing to suggest that McDaniels had any ground for supposing that the pass was related to a suicide threat, or indeed that the pass related to psychiatric problems. Accordingly, there is no evidence suggesting that McDaniels knew or should have known that Gaudreau was prone to suicide. Summary judgment will therefore be granted with respect to McDaniels on the federal civil rights claims.

### 3. *Lewis, Robinson, and Russell*

█ As detailed in the background section above, Lewis and Robinson were the officers assigned to Gaudreau's cell block at the time of the suicide. Lieutenant Russell was a ranking officer who was at the control booth when Gaudreau was discovered hanging. There is nothing in the record to indicate that any of these defendants had any prior knowledge of Gaudreau's suicidal disposition. Accordingly, examination focuses on the behavior of the three officers after they learned that Gaudreau was hanging in his cell. The question to be answered is whether, as to each of the three officers, the record establishes as a matter of law that this officer was not deliberately indifferent to a known medical need.

It is uncontested that neither Lewis nor Robinson entered Gaudreau's cell after learning that he was hanging. Defendants argue that the failure of Lewis and Robinson to attempt to aid Gaudreau was justified because the number of inmates who were in the cell at the time raised safety concerns. Plaintiffs, for their part, point to the IAD report, which characterized the behavior of Lewis and Robinson as "confused and disorganized" and stated that "the lack of decisive action cannot be condoned." In concluding that their conduct violated prison policy and procedure, the Internal Affairs investigator noted that a 1988 prison memorandum directed officers to: "elevate the victim to remove pressure on the throat; untie rope and place victim on the floor; loosen noose; give CPR if there is no pulse; and finally monitor and maintain an open air way." As the investigator further noted, the memorandum also directed officers to "request the assistance of other residents to elevate the victim."

On the record before the court, it cannot be said that the officers' failure to render aid to Gaudreau was constitutionally permissible as a matter of law. Gaudreau was last seen alive at approximately 3:05 p.m. and found hanging at 3:35 p.m. According to both the Internal Affairs report and Lieutenant Russell, Gaudreau was hanging—in a sitting position with his feet on the floor—from a hook approximately five feet from the ground. As currently developed, the record does not indicate an answer to the question whether Gaudreau was still alive and resuscitable at the time he was discovered hanging.

Whether there was a serious medical need is thus not really in dispute. A hanging victim is manifestly in need of first aid and medical attention, if only the relief of pressure around the neck. *See Monmouth County Correctional Institution Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir.1987)(A serious medical condition is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."), *cert. denied*, 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988). Since the officers all either saw Gaudreau hanging, or were told that he was, it is clear that the condition was known to the officers. What the parties contest is whether the evidence suggests culpability under the deliberate indifference standard.

Conceding that neither Lewis nor Robinson attempted to render aid, defendants cite the security concerns raised by the influx of detainees into the cell and deposition testimony indicating that officers are obliged to secure the block under these conditions. The plaintiffs point to the 1988 policy memo's instruction to enlist the aid of inmates, an instruction that fairly assumes that there will be inmates in the vicinity to whom such a request can be made. In short, defendants argue that their reaction was justified while plaintiffs urge that the evidence shows that the officers' inaction amounts to deliberate indifference. Given this conflict as to the inferences to be drawn from the evidence, whether Lewis and Robinson were deliberately indifferent is an unresolved question of fact. This conflict goes to the state of mind of the officers, a question that is particularly inapt for summary resolution on the basis of a cold record.[10]

■ Material issues of fact also exist as to Lieutenant Russell. Russell testified that he went into the cell and attempted, unsuccessfully, to lift Gaudreau, after which he instructed Brown to find something with which to cut Gaudreau down. Plaintiffs, however, argue that there is an issue of fact as to whether Russell even entered the cell. Plaintiffs point to the Internal Affairs report, which credited testimony by Dr. Wainwright and Nurses Detweiler and Chang placing Russell outside the cell and indicating that Russell made no efforts to lift Gaudreau. Given this conflict regarding the critical issue of whether Russell attempted to render any aid, a jury could reasonably conclude that he did not, and that he therefore was deliberately indifferent to a known medical need.

In sum, Lewis, Robinson, and Russell are not entitled to summary judgment on the merits of the constitutional claims. On this record, a jury could reasonably conclude that there was inaction in the face of a serious medical need of which the officers were aware and that such inaction violated Gaudreau's rights under the Due Process Clause. *See Heflin v. Stewart County, Tennessee*, 958 F.2d 709, 718 (6th Cir.1992)(noting that "responsible officers were doing nothing but waiting for someone else to make the first move" and holding "[i]t is reasonable to hold them to a standard that does not permit a victim to remain hanging for eight minutes or more").

■ *Qualified Immunity.* Nor, on this record, are Lewis, Robinson, and Russell entitled to qualified immunity. The application of the Eighth Amendment in situations where a prisoner or detainee presents a serious medical need has been firmly established by the Court's decision in *Estelle* and the myriad opinions that have applied it. No further canvass of decisional law is necessary. It should also be noted that the deliberate indifference standard has been applied not only in cases challenging officers' pre-suicide acts and omissions, but also in the very situation that the claims against officers Lewis, Robinson, and Russell present here: the failure to render aid when a detainee was

---

10. As Judge Wisdom has put the matter:
 The court should be cautious in granting a motion for summary judgment when resolution of the dispositive issues requires a determination of state of mind. Much depends on the credibility of witnesses testifying as to their own states of mind. In these circumstances the jury should be given an opportunity to observe the demeanor, during direct and cross-examination, of the witnesses whose states of mind are at issue.
 *Croley v. Matson Navigation Co.*, 434 F.2d 73, 77 (5th Cir.1970).

found hanging. *See Heflin,* 958 F.2d at 714. As set forth above, plaintiffs have raised issues of material fact regarding (1) whether Russell attempted to aid Gaudreau, and (2) whether the acknowledged fact that Lewis and Robinson did not attempt to render aid amounted to deliberate indifference. Thus, as to each of these officers, there is sufficient record evidence from which a fact-finder could infer that there was inaction amounting to deliberate indifference. In light of the clearly established law, it cannot be said that such inaction was, as a matter of law, objectively reasonable under the circumstances. Consequently, summary judgment will be denied as to the federal claims against Lewis, Robinson, and Russell.

## C. Civil Rights Claims Against the City of Philadelphia and Official Capacity Claims Against Prison Officials

Plaintiffs' claims against the City—as well as their official-capacity claims against Warden Speach and Deputy Commissioner Costello—are based on a "failure to train" theory. Plaintiffs allege that the City failed adequately to train officers in suicide prevention, suicide intervention, and life-saving first aid measures, and that this failure amounted to a policy or practice of deliberate indifference to the needs of psychologically impaired and potentially suicidal detainees. The defendants argue that they are entitled to summary judgment because the City had a training program and the program was adequate. For the reasons set forth below, I will deny the motion with respect to the § 1983 claims against the City. Because the official capacity claims against Speach and Costello merge with the claims against the City, the following applies as well to those claims. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)(A suit against "a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."); *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)("[P]laintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself."); *Monell v. Department of Social*

*Servs.,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)(Official-capacity suits "generally represent only another way of pleading an action against the entity of which the officer is an agent.").

### 1. Standard of Liability

"Failure to train" claims are analyzed as a species of "custom or practice" liability, the rudiments of which were set forth in *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and elaborated in *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). In *Monell,* the Court held that municipalities can be found liable under § 1983 for constitutional violations that are the result of an "official policy;" this rubric includes a custom or practice "even though such a custom has not received formal approval through the body's official decisionmaking channels." 436 U.S. at 691, 98 S.Ct. 2018. In *City of Canton,* the Court held that a city may be liable for a failure to train officers when that failure amounts to deliberate indifference; under such circumstances the failure to train amounts to "a city policy or custom that is actionable under § 1983." 489 U.S. at 389, 109 S.Ct. 1197. In explaining how it is that inadequate training can amount to a policy, the Court stated:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can be reasonably said to have been deliberately indifferent to the need.

489 U.S. at 390, 109 S.Ct. 1197. The Court recently reaffirmed the vitality of this passage in *Farmer,* 511 U.S. at 840–41, 114 S.Ct. 1970 (noting that an objective standard of knowledge is sufficient with respect to claims against municipalities) and more recently in *Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, ——, 117 S.Ct. 1382, 1391, 137 L.Ed.2d 626 (1997) (Deliberate indifference requires "proof that a municipal actor disregarded a known or obvious consequence of his action.").

In *Bryan County*, the Court emphasized its statement in earlier municipal liability cases that a plaintiff must show that the municipality was the "moving force" behind the constitutional violation. 520 U.S. at —, 117 S.Ct. at 1391; *see also City of Canton*, 489 U.S. at 390, 109 S.Ct. 1197; *Monell*, 436 U.S. at 694, 98 S.Ct. 2018. Thus the plaintiffs must identify a "deficiency in the city's training program" and show "that the deficiency actually caused the [correctional] officers' indifference." *City of Canton*, 489 U.S. at 391, 109 S.Ct. 1197. In *Colburn II*, the Third Circuit, elaborating upon the Supreme Court's municipal liability cases, articulated the standard for failure-to-train claims in this particular context. To succeed on failure-to-train claims with respect to prison suicides,

> the plaintiff must (1) identify specific training not provided that could reasonably be expected to prevent the suicide that occurred, and (2) must demonstrate that the risk reduction associated with the training is so great and so obvious that the failure of those responsible for the content of the training program to provide it can reasonably be attributed to a deliberate indifference to whether the detainees succeeded in taking their lives.

*Colburn II*, 946 F.2d at 1030.

### 2. The Record Evidence Regarding Risk, Training, and Causation

■ Plaintiffs urge that the Philadelphia Prison System's policy-makers had ample knowledge of the risk of detainee suicides before the events leading up to Gaudreau's suicide. Plaintiffs point to the deposition testimony of Dr. Edward Guy, a forensic psychiatrist who served for some thirty years as the Program Director of Mental Health Services in the Philadelphia Prison System. Dr. Guy testified that in 1983, at the informal

request of prison officials, he began a survey of twenty prison suicides that had occurred in the Philadelphia Prison System in the prior seven to eight years. Dr. Guy stated that he completed the survey in 1985, and embodied his findings in a report which, inter alia, recommended increasing services to the prison population. Dr. Guy testified that it was his opinion that there were too few hospital beds for psychiatric inpatients. The expert report of Dr. Rowan indicates that there were nine suicides, including Gaudreau's, from January 1990 to December 9, 1993.[11]

Defendants do not appear to raise a serious dispute regarding whether there existed a risk of detainee suicide, a risk of which policy-making officials knew or should have known. However, defendants seem unwilling to concede the point. In any event, the record certainly would support a finding that such a risk existed and that, under an objective standard, policymakers knew or should have known of it. Accordingly, I turn now to the question whether, as the City, Speach, and Costello contend, the record establishes that the City's training regime was constitutionally adequate as a matter of law.

The record discloses the following with respect to the training of correctional officers in matters relating to prison suicides. At the time of Gaudreau's suicide, officers-in-training were required to attend a one-hour to two-hour class on suicide prevention. There are also three documents relating to prisoner suicides. These are: (1) a 1984 memorandum from then-Director of Prison Health Services John Domzalski to all corrections officers "reemphasiz[ing] the need for continued alertness at all times and at all shifts for inmates who may exhibit suicidal behavior" ("1984 memorandum"); (2) the form for involuntary admission to the psychiatric unit

11. Dr. Guy testified that, pursuant to a request from prison authorities, he surveyed "a sample" of 20 suicides in Philadelphia prisons over a period of 7–8 years (there is no clear indication, one way or the other, whether these 20 were all of the suicides during the relevant period). Taking 8 years and 20 suicides as the outside figures, these data suggest an average incidence, from 1978–1985, of 2.5 suicides per year. Dr. Rowan's expert report noted that he examined a list of 9 suicides from January 1990 to nearly

the end of 1993 (some 16 months after Gaudreau's death), an average incidence of some 2.25 suicides per year. Dr. Rowan's report does not indicate whether the 9 suicides surveyed represented the extent of suicide deaths in the prison system during the relevant period. These aggregate data—while manifestly incomplete and extending beyond the time period directly at issue—suggest a fairly constant incidence of inmate suicides in the 70s, 80s, and 90s.

with an attendant instructional memorandum; and (3) a 1988 memorandum by Sheila Scott, M.D. on the subject of suicide detection and prevention directed to correctional officers ("1988 memorandum").

Defendants argue that this evidence establishes that the City had a "network of policies, procedures, and practices ... specifically related to suicidal patients." The defendants urge that the Prison System's documents—in particular the 1988 memorandum—in concert with the training provided at the academy conclusively demonstrate that the City's training was, as a matter of law, adequate.

The City's argument is focused almost exclusively upon the 1988 memorandum, which appears to be the primary record evidence of the content of the City's training with respect to suicide.[12] It is noteworthy, however, that, according to Deputy Commissioner Costello's deposition testimony, this document was a "directive" issued during officers' initial training rather than a formal Prison System policy. Costello acknowledged in his testimony that in 1992 there was "no formal policy and procedure" for rendering aid to one who had tried to commit suicide. Furthermore, although defendants argue that correctional officers received "broad-ranging and comprehensive" informal training, the record excerpts to which defendants point do not bear out this characterization.[13]

Hence it is not at all clear that defendants have met their burden of demonstrating that there is an absence of a genuine issue of material fact on the failure-to-train claims. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. However, even if it is assumed that defendants have met their initial burden, it is apparent that plaintiffs have met theirs by pointing to evidence demonstrating that a reasonable jury could find in their favor. *See Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505; *Russo v. City of Cincinnati*, 953 F.2d 1036, 1047 (6th Cir.1992).

As noted above, the City places primary emphasis on the 1988 memorandum, which, according to Costello's testimony, was used in connection with initial officer training. Plaintiffs, however, argue that, even if implemented, the memorandum and its contents were not used effectively. In support of this argument, plaintiffs point to the deposition testimony of correctional officers Murphy, McDaniels, Lewis, and Robinson—all of whom received their training at a time when the 1988 memorandum was, putatively, being implemented. The record reflects that none of the correctional officers deposed recalled (1) specific academy training relating to suicide awareness and prevention, (2) the 1988 memorandum or its contents, or (3) any retraining on suicide prevention, first aid, or CPR techniques.[14] Furthermore, plaintiffs'

---

**12.** It should be noted that the City also points to the 1984 memorandum, a 1½ page document bearing the subject heading "Need for Continuance of Suicide Alert and Vigilance." This document states that correctional officers have successfully intervened in suicide attempts and directs officers to look out for warning signs of suicidal inmates. Leaving aside the fact that there is no indication in the record of how, or to what extent, this memo was distributed, its existence does not alter the analysis in any material way. To the extent that the memorandum can be said to reflect the content of the training program, the text discussion of the 1988 memorandum applies with at least equal force to the 1984 memorandum.

**13.** *See* Costello deposition at 81–83, 85–86 ("through experience ... they would know what to do.... It's a lot of common sense training they receive on the job"); Randolph deposition at 16–17 ("Only thing I remember, I know we talked about what we do if a suicide. But I don't remember if it was before '92 or was it ...

after '92"). Deputy Commissioner Speach's deposition included the following colloquy:

Q Prior to 1992, were you aware of whether you were ever trained on how to recognize someone who might be a suicide risk and things to do, maybe, to prevent them from being jeopardized....
A Yes from my superiors on-the-job training they gave me when I first came there.
Q Back in 1961?
A '61 and as I went up through the ranks. Q Was there any books or documents or anything you received regarding that topic in terms of suicide?
A No. We might have gotten some directives. I'm not sure.
Speach deposition at 20–22, 33–34.

**14.** Additionally, Sergeant Richard Sforza, Correctional Training Administrator, testified that there were no written policies or specific procedures with respect to prison suicides in the Philadelphia Prison System. Sergeant Martha Aitken,

expert, Dr. Rowan, opined that officers in the Philadelphia Detention Center were not properly trained in suicide prevention measures. Dr. Rowan's expert reports noted in particular (1) that the 1988 memorandum was not adequate, and (2) that formal in-service training, not simply initial academy training, was necessary.[15]

Viewing the record evidence in plaintiffs' favor, I do not find that the City has demonstrated that there are no genuine issues of material fact with respect to its training program. Plaintiffs do not claim that the City provides no training at all; rather, plaintiffs challenge the sufficiency of the training that the City did provide. Beyond pointing to the existence of the academy class and the 1984 memorandum, the 1988 memorandum, and the involuntary commitment form, the City has offered no evidence to refute plaintiffs'

contentions that the content of the City's training program was inadequate. *See Russo v. City of Cincinnati*, 953 F.2d 1036, 1047 (6th Cir.1992).[16]

Furthermore, to the extent that the City relies heavily on its 1988 handout, it is apparent that a fact-finder could conclude from the record that the 1988 directives were not followed by the correctional officers on duty when Gaudreau hanged himself. As noted above, the record indicates that Officer Murphy failed to notify any other officer of Gaudreau's statement about self-harm[17] and failed to record the statement in the officer's log, both of which actions are very difficult to square with the 1988 memorandum's instructions that "[s]igns of suicidal behavior and threats must be entered in the log book and communicated to your supervisor and to the next shift. Refer to the Psychiatric Unit.

a CPR and first-aid instructor at the academy, testified that there was no retraining on suicide prevention or CPR after correctional officers graduated from the academy. Sergeant Aitken further testified that this lack of retraining rendered officers without sufficient knowledge of CPR measures, as she did not believe that officers retained sufficient knowledge without any retraining.

**15.** Dr. Rowan based his opinion on a review of, inter alia, the pleadings, discovery materials (including the deposition testimony of the officers), the City's documents relating to inmate suicides, the City's training logs, the IAD report, and a list of 9 suicides in the Philadelphia Prison System from January 1990 to December 9, 1993. Dr. Rowan also testified as an expert in the *Simmons v. City of Philadelphia* litigation, which resulted in a jury verdict in plaintiffs' favor on claims that the City had inadequately trained its correctional officers with respect to the risk of suicide among intoxicated pretrial detainees. This verdict was affirmed by the Third Circuit. *Simmons v. City of Philadelphia*, 947 F.2d 1042 (3d Cir.1991).

**16.** *Russo* involved, among other things, claims that a municipality had failed adequately to train its officers in dealing with mentally disturbed individuals, which failure led to police officers' unjustified shooting of the decedent. The evidence of training in *Russo* was similar to the evidence of record in this case. The *Russo* defendants, in support of summary judgment, pointed to evidence of training seminars (of 6–7 hours' length) and procedure manuals dealing with the general subject. In *Russo*, as in this case, plaintiffs' expert deemed the training inadequate and the relevant officers could not recall the content of any pertinent training. In revers-

ing the district court's grant of summary judgment, Judge Jones, writing for the Sixth Circuit, stated:

[W]e find the fact that the City offered a seven-hour course entitled "Disturbed–Distress Persons" insufficient in and of itself to shield the City from liability. Just as in *City of Canton*, where the officers were trained in an area that nominally addressed the needs of the relevant class of persons, but where the content and adequacy of that training was in dispute, we find that the City has not established that there exists no genuine issue of material fact as to the adequacy of the City's training. Although plaintiffs concede that the officers received the amount of training cited by the district court, they dispute that the *content* of the training was adequate. The City comes forth with no evidence to refute [plaintiffs' expert's] conclusion that the content of the training offered was inadequate. To uphold summary judgment to the City on this issue would, we believe, necessarily rest on the rule that a municipality may shield itself from liability for failure to train its police officers in a given area simply by offering a course nominally covering the subject, regardless of how substandard the content and quality of that training is. We do not believe that this is, or should be, the state of the law.

953 F.2d at 1047. I find *Russo* to be on point and persuasive.

**17.** The 1988 memorandum states: "The Correctional Officer is the person most able to observe, detect and prevent suicide among inmates" and lists as "Signs to Recognize," *inter alia,* "Talking about suicide to staff or other inmates."

Fill out 783 Form immediately."[18] Nothing in the record suggests that, despite Gaudreau's psychiatric history and his recent discharge from the psychiatric unit, he was ever identified as a suicide risk by any officer. It is also noteworthy that Gaudreau was locked, by himself, in a cell that was not near the control booth, while the 1988 memorandum contains the following directions: "2. House inmate with another inmate and, when possible, close to the Correctional Officer's Post. 3. IF UNABLE TO WATCH INMATE CLOSELY—REPORT THIS TO YOUR SUPERVISOR."

The record would also permit a reasonable fact-finder to conclude that the four officers on the scene after Gaudreau was found hanging failed to execute, or even attempt, any of the first aid measures appropriate for a hanging victim that are found in the 1988 memorandum. The document instructs the following:

1. If an inmate is found hanging, and while awaiting back-up, request assistance of other inmates to elevate the victim so as to remove pressure from throat.

2. Cut "rope" and place victim on floor.

3. Loosen the noose but do not remove if inmate appears unconscious or lifeless.

4. If there is no pulse give C.P.R.

5. Monitor and maintain an open airway. It is uncontested that neither Lewis nor Robinson ever entered the cell. Although the officers cited security concerns raised by the number of detainees on the scene, this justification sits uneasily with the prescription set forth above indicating that inmates are to be enlisted in the effort to relieve pressure on the victim's throat.[19] Additionally, although Russell testified that he attempted to lift Gaudreau, there is, as noted above, a conflicting account in the record.[20] It is also noteworthy that the record shows that Russell received his training before the 1988 memorandum was implemented, and that he could recall neither initial training nor retraining on suicide issues during his twelve-year tenure with the prison system.

On the whole, the record of this particular incident, viewed, as it must be on summary judgment, in plaintiffs' favor, would support a fact-finder in drawing an inference that a systemic problem existed: that is, the record would lend support to a finding that none of the officers involved, either before or after the incident, followed the instructions contained in the training materials proffered by the City. At the very least, these failures suggest the possibility that the 1988 memorandum and the academy training had not been deployed in an effective manner.[21] To

**18.** It bears noting here that although Murphy did place a call to the Hahnemann Unit, he did not fill out the involuntary commitment form.

**19.** This proffered justification also sits uneasily with the more contemporaneous accounts of the incident found in the interview records from the IAD report. The IAD investigator, R. Pezanowski, interviewed all of the officers implicated in this discussion on the day following the suicide, none of whom reported that there was an influx of prisoners into the cell. According to the report, when the IAD officer asked Lewis whether he considered cutting the inmate down and administering CPR, Lewis answered in the negative. Lewis, according to the report, said that he remembered being taught in training to cut the victim down with the aid of his partner, but because his partner was in the control booth, he was unsure what to do. When Robinson was asked the same question, according to the IAD, Robinson replied: (1) he had nothing with which to cut Gaudreau down, (2) there were no "plastic respiratory instruments" in the housing area with which to take life-saving measures, and (3) "in the confusion of the moment," he was more concerned with alerting central control and se-

curing (i.e., locking in) the inmates. These factual tensions distinguish this case from *Rellergert*. In that case, the Eighth Circuit concluded that a duty officer who had remained in his control booth in accordance with prison procedure, and who had followed all other relevant prison procedures, did not act with deliberate indifference in failing to leave his control booth when an inmate on suicide watch had left the area from which he could be observed by the duty officer. 924 F.2d at 795, 797.

**20.** Nor is it abundantly clear that one attempt to lift the body, without enlisting aid, should be deemed adequate as a matter of law.

**21.** Defendants place considerable reliance upon Judge Bechtle's decision in *Littlejohn v. City of Philadelphia*, 1994 WL 505050 (E.D.Pa.1994). In that case, Judge Bechtle referred to the 1988 memorandum as evidence that the City had a training program with respect to detainee suicide, in granting the City's motion for directed verdict on plaintiffs' failure-to-train claims against the City. *Littlejohn* seems inapposite. The court's ruling on the merits of the failure-to-

be sure, the Supreme Court has cautioned against creating an inference of failure to train from an isolated incident. *See Bryan County,* 520 U.S. at ——, 117 S.Ct. at 1390; *City of Canton,* 489 U.S. 378, 390–91, 109 S.Ct. 1197, 103 L.Ed.2d 412 ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program"). However, the record in this case would support an inference that the events leading up to and following Gaudreau's suicide amounted to a good deal more than an isolated instance that could be attributed to the negligence of, or the failure to train, one employee.[22] "The existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the 'moving force' behind the plaintiff's injury." *Bryan County,* 520 U.S. at ——, 117 S.Ct. at 1390; *see also Russo,* 953 F.2d at 1046 (noting that "although the officers conceded that they were frequently called upon to deal with emotionally disturbed and disabled individuals, none were able to give specific responses as to the content of their training.").

Plaintiffs' unrebutted expert testimony and the very course of events in this case would permit a reasonable fact-finder to conclude that the City, although aware of the problem of suicide within City correctional facilities,

failed to do more than go through the motions of training its correctional officers in suicide prevention and in administering first aid to a person found hanging. Of course, a fact-finder might, on this record, conclude that the City made good faith, albeit occasionally unsuccessful efforts to address an intractable problem. The point, at the summary judgment stage, is that a fact-finder might find against or for the City with respect to the constitutional adequacy of its training efforts. I am, therefore, precluded from holding as a matter of law that the City fulfilled its constitutional duty in this regard. *See Russo v. City of Cincinnati,* 953 F.2d 1036, 1047 (6th Cir.1992).

Finally, I consider one last facet of failure-to-train analysis—the causal nexus. Although the evidence, for the purposes of this motion, of the requisite causal nexus is implicit in the discussion above, some separate discussion is warranted. The Supreme Court has emphasized that plaintiffs who press failure-to-train claims must show that inadequacies in the training program must bear a causal relationship to the ultimate injury:

> [F]or liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury.... [The plaintiff] must still prove that the deficiency in training actually caused the [constitutional injury]. Would the injury have been avoided had the employee been trained

---

train claims came at the close of evidence, when the court concluded that plaintiffs had failed to produce any evidence indicating a failure to train and that the only evidence relating to training was the 1988 memorandum, which, standing alone, tended to suggest otherwise. In the present case, however, plaintiffs have adduced substantial record evidence tending to show that the training, even with the memorandum, was not adequate.

**22.** It should also be noted that the *Simmons v. City of Philadelphia* litigation would lend credence to a finding that the City failed adequately to train its prison staff. The *Simmons* case resulted in a jury verdict, affirmed by the Third Circuit in 1991, against the City of Philadelphia on claims that it had inadequately trained its officers with respect to the suicide risks posed by intoxicated pretrial detainees. *Simmons v. City*

*of Philadelphia,* 947 F.2d 1042 (3d Cir.1991)(opinion of Becker, J., announcing judgment of the court). Thus policymakers were clearly put on notice in 1991 that their training was constitutionally deficient with respect to at least one subset of the detainee population (a risk group identified in the 1988 memorandum). As the Supreme Court has recently noted:

> If a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the "deliberate indifference"—necessary to trigger municipal liability.

*Bryan County,* 520 U.S. at ——, 117 S.Ct. at 1390.

under a program that was not deficient in the identified respect? *City of Canton*, 489 U.S. at 391, 109 S.Ct. 1197. On the record before the court, it is apparent that plaintiffs have made a showing on this issue sufficient to withstand summary judgment.[23]

Therefore, defendants' motion for summary judgment will be denied as to the City and as to defendants Speach and Costello as sued in their official capacities.

### D. Individual–Capacity Claims Against Prison Officials Speach and Costello

The last of the federal claims to be addressed, therefore, are the individual-capacity claims against Speach and Costello.

■ Defendants' first argument need not detain us long. Defendants urge that plaintiffs' claims against the officials in their personal capacities must fail because they state a form of *respondeat superior* liability, which is not available in federal civil rights actions under § 1983. The defendants argue that summary judgment is appropriate because it cannot be said that Speach or Costello were personally involved in the alleged constitutional violations against Gaudreau. Plaintiffs, however, argue that the prison officials may be found liable because these defendants were policy-makers who, with deliberate indifference, fostered a custom or practice—an inadequate training program with respect to suicide prevention and detection—that directly caused Gaudreau's alleged constitutional deprivation. This species of individual liability is clearly available under § 1983. Individual defendants can be found liable if it can be shown that the individual defendants, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused

[the] constitutional harm." *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir.1989); *see also Baker v. Monroe Township*, 50 F.3d 1186, 1190 n. 3 (1995). As the Third Circuit has held, "this is not *respondeat superior* liability but an assertion of liability against the individual defendants based on theories recognized in a line of Supreme Court cases." *Stoneking*, 882 F.2d at 725. Consequently, I turn to the merits of the individual-capacity claims against Costello and Speach.

■ Thomas Costello assumed the post of Deputy Commissioner of the Philadelphia Prison System in 1990 in order to head a "policy and procedures division" created to comply with a court order. According to Costello, prison authorities had determined that formal policies and procedures were needed for many, if not all, aspects of the administration of the Prison System. By August of 1992, the date of the events in this case, the Prison System had completed the task of developing formal procedures for the use of force. Formal policies with respect to suicide were completed in 1994.

Wilhemina Speach was the warden of the Philadelphia Detention Center from 1991 to 1996. Plaintiffs urge that Ms. Speach should be held liable for not having acted to correct prison policies with respect to suicide prevention. Plaintiffs point to deposition testimony indicating that Speach knew of no official policies or procedures relating to suicide prevention at the time that Gaudreau committed suicide and that she, in 1994, reviewed and signed off on the first set of comprehensive policies on the subject.

In sum, the record, which is relatively meager on this point, would not support a fact-finder in finding that Costello's inaction

---

23. The City's own document, the 1988 memorandum, suggests a fairly obvious course of training that, had it been effectively implemented, could be found to have prevented Gaudreau's suicide, or at least prevented Gaudreau's actions from being fatal. As the text discussion suggests, the memorandum's instructions on suicide alertness and prevention—identifying inmates with suicidal propensities, conveying information to fellow officers and superiors, monitoring the inmate, and filling out the commitment form—were all precautions that, had they followed, might have

helped to avert this incident. Furthermore, the memorandum's instructions with respect to aiding a hanging victim—untying the knot, cutting the victim down, administering CPR—might have prevented the incident from being fatal, if Gaudreau had been resuscitable when he was discovered. It is, in sum, clear from the record that plaintiffs have met their burden of showing that there exist triable issues with respect to the adequacy of the City's training and the connection between the putatively inadequate training and the constitutional violation alleged.

amounted to deliberate indifference with respect to detainee suicide. Although the Third Circuit has indicated that officials may be liable in their individual capacities when such officials have, with deliberate indifference to the consequences, acted in some way to establish or maintain a policy, practice, or custom that directly causes constitutional deprivation—see *Stoneking*, 882 F.2d at 725—plaintiffs have made no showing from which it can be inferred that either Speach or Costello is liable according to this standard. The record would not support the supposition that either Speach or Costello—both of whom assumed their posts not long before the events in question—*established* the practices or customs complained of. Nor does the record furnish a fact-finder with enough data from which to infer that these officials *maintained* the conditions which, as plaintiffs allege, caused Gaudreau's injury.

Accordingly, summary judgment will be granted with respect to the individual-capacity claims against defendants Costello and Speach.

## II. State–Law Claims

Defendants have moved for summary judgment with respect to plaintiffs' state-law claims on the ground that these claims are barred by Pennsylvania's Political Subdivisions Tort Claims Act, 42 Pa. Cons.Stat. Ann. §§ 8541–8564. Plaintiffs have submitted that they have no opposition to summary judgment—on their state-law claims—in favor of the following defendants: the City of Philadelphia, Costello, Speach, and McDaniels. Therefore, summary judgment will be granted in favor of those defendants.

Although their complaint alleges manifold state-law claims, in resisting summary judgment plaintiffs have elected only to press claims of willful misconduct, and they have chosen to proceed only against defendants Murphy, Lewis, Robinson, and Russell. Accordingly, left for decision is whether, to the extent that plaintiffs' complaint alleges tort causes of action based upon willful misconduct, these four defendants are immune as a matter of law.

■■ Under the Political Subdivisions Tort Claims Act, individual officers are immune to the same extent that their employing entity is immune. 42 Pa. Cons.Stat. Ann. § 8545. Hence, through the confluence of § 8545 (official liability) and § 8541, which grants broad immunity to local agencies (except as otherwise provided elsewhere in the code), local officials enjoy expansive state-law immunity from actions taken by them in the course of their official duties. However, § 8550 exempts claims based upon "willful misconduct" from the statute's grant of immunity. Hence, it must be decided whether plaintiffs have stated, and supported with record evidence, claims that the relevant officers committed "willful misconduct" as contemplated by the statute.

The relevant claims are pleaded under the heading "wrongful death action" in plaintiffs' complaint. The complaint does not differentiate among plaintiffs' state-law tort claims with any specificity, but counts II, IV, and IX of plaintiffs' complaint allege "reckless and deliberate indifference" by officers (including the four under consideration) who by virtue of their employment had a "special relationship" to the decedent. It appears, then, that the state of mind alleged in plaintiffs' complaint is essentially equivalent to that which applies to plaintiffs' federal claims. As noted in section I above, plaintiffs have met their burden with respect to the federal standard of deliberate indifference with respect to these defendants.

Consequently, it is necessary to address whether deliberate indifference constitutes "willful misconduct" within the meaning of the Political Subdivision Tort Claims Act. In *Renk v. City of Pittsburgh*, 537 Pa. 68, 641 A.2d 289, 294 (1994), the Pennsylvania Supreme Court undertook to apply § 8550's "willful misconduct" exception in the context of police misconduct. As I concluded in the MOVE case, the *Renk* decision construed "willful misconduct" to mean "misconduct which the perpetrator recognized as misconduct and which was carried out with the intention of achieving exactly that wrongful purpose." *In Re City of Philadelphia Litig.*, 938 F.Supp. 1264, 1273 (E.D.Pa.1996). It is

readily apparent that plaintiffs have neither alleged nor shown this level of scienter.

The *Renk* court, however, noted that in cases not involving police misconduct, "willful misconduct" had been defined by the Commonwealth Court as "conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied." *King v. Breach,* 115 Pa.Cmwlth. 355, 540 A.2d 976, 981 (1988)(citing *Evans v. Philadelphia Transportation Company,* 418 Pa. 567, 212 A.2d 440 (1965)). Although the Pennsylvania Supreme Court in *Renk* found *King* to be inapplicable in police cases, nothing in the *Renk* decision invalidated the Commonwealth Court's understanding of "willful misconduct" as it applies to non-police cases.

Because this case is not a police misconduct case in the sense that *Renk* or the MOVE litigation was, *King* appears to be good authority in this context. In *King,* a state hospital nurse sued county prison and mental health programs and officials after a patient assaulted her. Affirming a grant of summary judgment for all defendants, the *King* court concluded that although there were "general allegations" that the individual defendants committed willful misconduct that permitted the assault, the record evidence was "insufficient to support a conclusion that the [individual defendants] must have believed and known that the assault of the [nurse], or some other person ... was substantially certain to follow ... so that it would have to be said that [the defendants] intended such a result." 540 A.2d at 981.[24]

 It is apparent that plaintiffs' claims in this case do not rise to the level of "willful misconduct" as interpreted in *King.* Plaintiffs do not appear to have alleged that the officers acted (or refrained from acting) with the requisite intent—that is, that the officers desired to bring about Gaudreau's suicide or knew to a substantial certainty that such would be the result of their acts and omissions. Nor would the record support such claims if they had been advanced. The record would permit a reasonable fact-finder to reach the conclusion that the officers acted with "deliberate indifference"—as used in the federal constitutional cases—but that is a standard which falls short of intent to cause harm; the record shows no more. Consequently, summary judgment will be granted with respect to all state-law claims against Murphy, Lewis, Robinson, and Russell.

## Conclusion

For the foregoing reasons, defendants' motion for summary judgment will be denied with respect to the federal claims against Murphy, Lewis, Robinson, Russell, and the City of Philadelphia. Summary judgment will be granted with respect to individual-capacity claims against officials Speach and Costello, but denied with respect to the official-capacity claims against the two officials. Summary judgment will be granted with respect to the federal claims against defendants Brown, Clark, Morris, Gallagher, McDaniels, and Daughen. And summary judgment will be granted with respect to plaintiffs' state-law claims against all defendants.

---

**24.** There is language in the Commonwealth Court's opinion in *Kuzel v. Krause,* 658 A.2d 856 (Pa.Cmwlth.1995), that appears to lend support for the proposition that proof satisfying a "knew or should have known" standard, *id.* at 860, would be sufficient to establish "willful misconduct" in a setting—like that in *Kuzel* and in the case at bar—does not involve police misconduct in the in the *Renk* sense. With all respect, I think the Commonwealth Court was on firmer ground when, in *Kuzel,* it opined that in *Renk,* "[i]n effect the Supreme Court found that 'willful misconduct,' as used in 42 Pa.C.S. § 8550, means 'willful misconduct aforethought.'" *Id.* That characterization fits better with the *Kuzel* court's earlier expression of adherence to the principles the Commonwealth Court had announced seven years before in *King v. Breach:* "'willful misconduct' is synonymous with the term 'intentional tort.' *King v. Breach* .... The government employee must desire to bring about the result that followed his conduct or be aware that it was substantially certain to follow." 658 A.2d at 859.